JN:PC
F. #2021R00355

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION
OF THE UNITED STATES OF AMERICA
FOR A SEARCH WARRANT FOR (1) THE
PREMISES KNOWN AND DESCRIBED
AS 4207 AMBOY ROAD, APT. 4, STATEN
ISLAND, NY 10308, (2) A WHITE 2008
MERCEDES-BENZ C 300 SEDAN WITH
VEHICLE IDENTIFICATION NUMBER
WDDGF81X38F076205, AND ALL
LOCKED AND CLOSED CONTAINERS
LOCATED THEREIN, AND (3) AN APPLE
IPHONE 7 WITH IMSI #310260056196503

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

SEARCH WARRANT APPLICATION

21-MJ-759

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH WARRANTS**

I, THOMAS A. NUZIO, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for search warrants for

the premises known and described as 4207 Amboy Road, Apt. 4, Staten Island, NY 10308 (the

"SUBJECT PREMISES"), a white 2008 Mercedes-Benz C 300 sedan with vehicle identification

number ("VIN") WDDGF81X38F076205 (the "SUBJECT VEHICLE"), and all locked and

closed containers located therein, and an Apple iPhone 7 with IMSI #310260056196503 (the

"SUBJECT PHONE").   The property to be searched is described in the following paragraphs

and in Attachments A-1, A-2 and A-3, and the property to be seized is described in the following

paragraphs and in Attachments B-1, B-2 and B-3.[1]

---

[1] Because the purpose of this affidavit is to set forth only those facts necessary to establish

2.      I am a Detective with the New York City Police Department ("NYPD") and a Task Force Officer with the NYPD and Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Joint Robbery Task Force ("NYPD/ATF Joint Robbery Task Force"), duly appointed according to law and acting as such.   I have been involved in the investigation of numerous robbery cases.   I have been a Detective since 2017, and I have been a Task Force Officer for approximately 18 months.   I am familiar with the facts and circumstances set forth below from my participation in the investigation, my review of the investigative file, indoor and outdoor surveillance camera and body camera videos and from reports of other law enforcement officers involved in the investigation.

3.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1951 (Hobbs Act Robbery) (the "SUBJECT OFFENSE") have been committed, are being committed, and will be committed by STEVEN ALLESANDRO ("Suspect-2" or "ALLESANDRO").   There is also probable cause to search the property described in Attachments A-1, A-2 and A-3 for evidence, instrumentalities, contraband, or fruits of the SUBJECT OFFENSE, as further described in Attachments B-1, B-2 and B-3.

## PROBABLE CAUSE

4.      On or about March 29, 2021, at approximately 6:25 a.m., a hotel located at 1100 South Avenue, Staten Island, New York, was robbed (the "Robbery").   According to victim statements made to the NYPD and indoor and outdoor surveillance videos, including hotel

_____

probable cause to search, I have not described all the relevant facts and circumstances of which I am aware.

lobby and parking lot surveillance footage, which I have reviewed, two male suspects entered the hotel and asked for a manager.   When the manager arrived at the front desk, Suspect-1, a heavy-set white male, went around the reception desk, displayed a pistol, and demanded money. Suspect-2, a white male with a thinner build, who was wearing a dark colored hooded jacket with a unique pattern, blue jeans and black and white Nike sneakers, told the manager to do what Suspect-1 said.   The suspects' faces were obscured from the nose down by masks, but their clothing was visible from the hotel lobby and parking lot security camera footage.   The hotel manager unlocked the cash drawer, and Suspect-1 retrieved approximately $1,500 in cash in an envelope and other loose $20 bills.   Suspect-1 then fumbled with the money, discharged the pistol and both men fled the hotel with the stolen cash.

5.      Surveillance footage from NYPD Argus stationary cameras, Ring home security cameras and a Metropolitan Transit Authority bus near the Robbery scene showed a white Mercedes-Benz with a distinctive panoramic sunroof and what appeared to be a gold colored New York license plate (the "Robbery Mercedes-Benz") traveling towards the Robbery scene at approximately 5:40 a.m. and leaving the Robbery scene at approximately 6:30 a.m. The numerical details of the license plate were not discernable on the footage, but the Robbery Mercedes-Benz had unique characteristics: only the left rear plate lamp was illuminated and the front license plate was misaligned or offset towards the passenger side.   An NYPD vehicle analyst was able to determine based on the characteristics of the Robbery Mercedes-Benz that it was likely a 2008-2014 Mercedes-Benz C Class sedan.   A search of NYPD databases was run to identify vehicles matching the characteristics of the Robbery Mercedes-Benz that were known to

3

the NYPD based on arrests in Staten Island between January 1, 2021 and April 8, 2021 and

based on the Vehicle Identification Number ("VIN")[2] sequence that corresponds to 2008-2014

Mercedes-Benz C Class sedans:   "WDDGF."   That search identified 11 potential vehicles and

multiple prior NYPD encounters with ALLESANDRO operating a vehicle matching the

characteristics of the Robbery Mercedes-Benz.

    6.  On February 9, 2021, prior to the Robbery, NYPD body camera footage

showed that ALLESANDRO was stopped by the NYPD for traffic infractions (the "February 9

Stop") while operating a white 2008 Mercedes-Benz sedan with a panoramic sunroof, which was

the same style vehicle as the Robbery Mercedes-Benz seen on surveillance footage the morning

of the Robbery.   During the February 9 Stop, the Mercedes-Benz vehicle ALLESANDRO was

operating had temporary New Jersey license plate 842244N, which did not match the Mercedes-

Benz and instead returned as "not issued."[3]   During the February 9 Stop, ALLESANDRO was

issued a desk appearance ticket for traffic infractions.   In connection with the February 9 Stop,

the NYPD obtained the VIN for the vehicle ALLESANDRO was operating,

WDDGF81X38f076205, which returned to the SUBJECT VEHICLE.

---

[2]  A VIN is a unique number assigned to a vehicle by its manufacturer, which is permanently affixed to a vehicle, whereas a license plate and motor vehicle registration is able to be transferred between vehicles and is not permanently affixed to any single vehicle.   A VIN is specific to a vehicle's year of manufacture.

[3]  Multiple license plate reader images from February 10, 2021 also showed that the Mercedes-Benz vehicle ALLESANDRO was operating during the February 9 Stop had an inoperable right rear license plate lamp.

7.     On March 10, 2021, prior to the Robbery, NYPD body camera footage showed that ALLESANDRO was stopped by the NYPD for traffic infractions (the "March 10 Stop") while operating a white 2008 Mercedes-Benz C 300 sedan with a panoramic sunroof and a gold colored New York license plate with registration HNE1777, which is the same style vehicle and license plate type as the Robbery Mercedes-Benz seen on camera footage on the morning of the Robbery.   Body camera footage from the March 10 Stop confirmed that the 2008 white Mercedes-Benz C 300 sedan ALLESANDRO was operating during the March 10 Stop also had an inoperable right rear plate lamp, which the officer orally noted to ALLESANDRO. Nonetheless, an NYPD license plate check indicated that New York license plate HNE1777 did not return to a white Mercedes-Benz, and instead returned to a 2007 blue Jeep Grand Cherokee that was not registered to ALLESANDRO.   During the March 10 Stop, ALLESANDRO identified himself by name and provided identification, and ALLESANDRO was seen on body camera footage wearing a dark colored hooded jacket with a unique pattern, which resembled that of Suspect-2 on the morning of the Robbery.   While officers were questioning ALLESANDRO and a passenger, they determined that ALLESANDRO had a suspended driver's license.   When officers asked ALLESANDRO to exit the vehicle because he was not a licensed operator, ALLESANDRO fled the scene of the March 10 Stop in the white Mercedes-Benz.

8.     On March 12, 2021, during an arrest (the "Arrest") on charges related to fleeing the March 10 Stop, body camera footage showed ALLESANDRO wearing clothing substantially similar to that of Suspect-2 from the Robbery and similar to what ALLESANDRO

was wearing during the March 10 Stop: a dark colored hooded jacket with a unique pattern, blue jeans and black and white Nike sneakers.

9.     In connection with his processing during the Arrest, ALLESANDRO provided the NYPD with his telephone number (the "Telephone Number").   On April 21, 2021, the Honorable Robert M. Levy, Eastern District of New York, United States Magistrate Judge, issued a search warrant for historical cell-site information for the Telephone Number.   (See Case No. 21-MC-1244.)   Information pursuant to that warrant was received on or about May 11, 2021 and indicates that the Telephone Number is associated with the SUBJECT PHONE.   Historical cell-site information showed that in the hours prior to the Robbery, and at approximately 3:58 a.m., the Telephone Number associated with ALLESANDRO was communicating with a cellular tower proximate to the SUBJECT PREMISES.   Historical cell-site information also showed that in the minutes following the Robbery, at approximately 6:40 a.m., the Telephone Number associated with ALLESANDRO was communicating with a cellular tower proximate to the Robbery location, which was approximately eight miles away from the SUBJECT PREMISES.

10.     Historical cell-site data for the entire month of March 2021 showed that, during the hours of 4 a.m. and 7 a.m., which is the timeframe in which the robbery occurred, aside from the day of the robbery, the Telephone Number associated with ALLESANDRO was in the vicinity of the Robbery on only two occasions:   March 6th and March 23rd.   On all other days of March 2021, historical cell-site data showed that, between 4 a.m. and 7 a.m., the Telephone Number associated with ALLESANDRO was usually in the area of the SUBJECT PREMISES or in downtown Brooklyn proximate to an address where Suspect-1 is known to stay

with his girlfriend.   Further, T-Mobile records show that, on March 29, 2021, the Telephone

Number associated with ALLESANDRO and the SUBJECT PHONE was using the T-Mobile

network at approximately 4:01 a.m., 6:40 a.m., 6:42 a.m., 6:43 a.m., 6:44 a.m., 6:46 a.m., 6:47

a.m., immediately before and after the Robbery.

        11.    On or about June 19, 2021, NYPD officers observed a white Mercedes-

Benz C 300 sedan with a panoramic sunroof that matched the characteristics of the Robbery

Mercedes-Benz parked in the apartment complex where the SUBJECT PREMISES is located

and in which ALLESANDRO resides.   The vehicle was observed with a New Jersey temporary

plate and registration, W204848, which is a different temporary plate and registration from that

observed on the white Mercedes-Benz ALLESANDRO was operating during the February 9

Stop.   NYPD officers have previously observed ALLESANDRO operating a Cadillac sedan

using New Jersey temporary registration W204848.

        12.    In sum, the foregoing shows that evidence, instrumentalities, contraband,

and fruits of the SUBJECT OFFENSE are currently located at the SUBJECT PREMISES, in the

SUBJECT VEHICLE, and on the SUBJECT PHONE, including but not limited to the distinctive

jacket ALLESANDRO was wearing during the Robbery, the March 10 Stop, and the Arrest, the

firearm used in the commission of the Robbery, communications related to the planning and

carrying out of the Robbery that were made using the SUBJECT PHONE and proceeds of the

Robbery.   Accordingly, based on the above, there is probable cause to believe that a search of

the things described in Attachments B-1, B-2 and B-3 will provide evidence, fruits and

instrumentalities of violations of federal law, including the SUBJECT OFFENSE.   This

application seeks to search the SUBJECT PREMISES and the SUBJECT VEHICLE and any

locked and closed containers therein, as well as the SUBJECT PHONE.

## **TECHNICAL TERMS**

13.     Based on my training and experience, I use the following technical terms

to convey the following meanings:

a.     Wireless telephone:   A wireless telephone (or mobile telephone,

or cellular telephone) is a handheld wireless device used for voice and data communication

through radio signals.   These telephones send signals through networks of transmitter/receivers,

enabling communication with other wireless telephones or traditional "land line" telephones.   A

wireless telephone usually contains a "call log," which records the telephone number, date, and

time of calls made to and from the phone.   In addition to enabling voice communications,

wireless telephones offer a broad range of capabilities.   These capabilities include: storing

names and phone numbers in electronic "address books;" sending, receiving, and storing text

messages and e-mail; taking, sending, receiving, and storing still photographs and moving video;

storing and playing back audio files; storing dates, appointments, and other information on

personal calendars; and accessing and downloading information from the Internet.   Wireless

telephones may also include global positioning system ("GPS") technology for determining the

location of the device.

b.     Digital camera:   A digital camera is a camera that records pictures

as digital picture files, rather than by using photographic film.   Digital cameras use a variety of

fixed and removable storage media to store their recorded images.   Images can usually be

retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.   Removable storage media include various types of flash memory cards or miniature hard drives.   Most digital cameras also include a screen for viewing the stored images.   This storage media can contain any digital data, including data unrelated to photographs or videos.

> c.    Portable media player:   A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.   However, a portable media player can also store other digital data.   Some portable media players can use removable storage media.   Removable storage media include various types of flash memory cards or miniature hard drives.   This removable storage media can also store any digital data.   Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

> d.    GPS:   A GPS navigation device uses the Global Positioning System to display its current location.   It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.   Each satellite contains an extremely accurate clock.   Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.   These signals are sent by radio, using specifications that are

publicly available.   A GPS antenna on Earth can receive those signals.   When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.     PDA:   A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.   Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.   PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.   Removable storage media include various types of flash memory cards or miniature hard drives.   This removable storage media can store any digital data.   Most PDAs run computer software, giving them many of the same capabilities as personal computers.   For example, PDA users can work with word-processing documents, spreadsheets, and presentations.   PDAs may also include GPS technology for determining the location of the device.

        f.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.   An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).   Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.   Most Internet service providers control a range of IP addresses.   Some computers have static—that is,

10

long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.     Internet:   The Internet is a global network of computers and other electronic devices that communicate with each other.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

14.     Based on my training, experience, and research, I know that the SUBJECT PHONE has capabilities that allows it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.   In my training and experience, examining data stored on the SUBJECT PHONE of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

15.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.   Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.   This information can sometimes be recovered with forensics tools.

16.     *Forensic evidence.*   As further described in Attachment B-3, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crime described in the warrant, but also forensic evidence that establishes how the SUBJECT PHONE was used, the purpose of its use, who used it, and when.

11

There is probable cause to believe that this forensic electronic evidence might be on the
SUBJECT PHONE because:

        a.      Data on the storage medium can provide evidence of a file that was
once on the storage medium but has since been deleted or edited, or of a deleted portion of a file
(such as a paragraph that has been deleted from a word processing file).

        b.      Forensic evidence on a device can also indicate who has used or
controlled the device.   This "user attribution" evidence is analogous to the search for "indicia of
occupancy" while executing a search warrant at a residence.

        c.      A person with appropriate familiarity with how an electronic
device works may, after examining this forensic evidence in its proper context, be able to draw
conclusions about how electronic devices were used, the purpose of their use, who used them,
and when.

        d.      The process of identifying the exact electronically stored
information on a storage medium that are necessary to draw an accurate conclusion is a dynamic
process.   Electronic evidence is not always data that can be merely reviewed by a review team
and passed along to investigators.   Whether data stored on a computer is evidence may depend
on other information stored on the computer and the application of knowledge about how a
computer behaves.   Therefore, contextual information necessary to understand other evidence
also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

17.     *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the SUBJECT PHONE in a manner consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

18.     *Manner of execution.*   Because this warrant seeks permission to examine the SUBJECT PHONE that is believed to be in STEVEN ALLESANDRO's possession and may be located within the SUBJECT PREMISES or SUBJECT VEHICLE, execution of this warrant may require intrusion into the SUBJECT VEHICLE or SUBJECT PREMISES.   Accordingly, authority to seize and search the SUBJECT PHONE is being sought concurrently with authority to seize and search the SUBJECT PREMISES and SUBJECT VEHICLE.   As with all warrants, I expect that this warrant will be executed reasonably and during the hours of 6 a.m. and 6 p.m.

## AUTHORIZATION REQUEST

19.     Based on the foregoing facts, I request that the Court issue the proposed search warrants pursuant to Federal Rule of Criminal Procedure 41.

20.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrants, be sealed until further order of the Court.

These documents discuss an ongoing criminal investigation that is neither public nor known to

the targets of the investigation.   Accordingly, there is good cause to seal these documents

because their premature disclosure may seriously jeopardize that investigation, including by

giving the targets an opportunity to destroy or tamper with evidence, change patterns of

behavior, notify confederates and flee from prosecution.

THOMAS A. NUZIO
Task Force Officer
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Sworn to before me by telephone this
___ day of June, 2021

THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

14

## ATTACHMENT A-1

### Property to be Searched

The SUBJECT PREMISES is located at 4207 Amboy Road, Apt. 4, Staten Island, NY 10308, and is the residence of STEVEN ALLESANDRO.   ALLESANDRO is believed to share the residence with his mother.   The SUBJECT PREMISES is a tan, two-story attached house with a white door and an exterior entrance with the apartment number, "4," above the door.



15

## ATTACHMENT A-2

Property to be Searched

      The SUBJECT VEHICLE is a white 2008 Mercedes-Benz C 300 sedan with a panoramic sunroof and vehicle identification number WDDGF81X38F076205.   The SUBJECT VEHICLE was observed on or about June 19, 2021 in the parking lot located in front of the apartments at 4207 Amboy Road, Staten Island, NY 10308, which is the complex in which STEVEN ALLESANDRO's residence is located.





## ATTACHMENT A-3

Property to be Searched

The SUBJECT PHONE is an iPhone 7 with IMSI #310260056196503 believed to be in the possession of STEVEN ALLESANDRO in Staten Island.   The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B-3.

**ATTACHMENT B-1**

Property to be Seized

1.      All evidence, instrumentalities, contraband, or fruits of a violation of Title 18, United States Code, Section 1951(a) (the "SUBJECT OFFENSE"), involving the March 29, 2021 armed robbery of the Hilton Garden Hotel located at 1100 South Avenue, Staten Island, New York 10314, found within the SUBJECT PREMISES, as described in Attachment A-1, or within any locked or closed containers therein.

2.      Evidence, instrumentalities, contraband, or fruits of the SUBJECT OFFENSE includes but is not limited to:

        (a)     Items of clothing worn by Suspect-2 and identified in surveillance footage of the Robbery, including a dark colored hooded jacket with a cross-stitched pattern and black and white Nike sneakers;

        (b)     Any firearm(s), ammunition, magazine(s), or other firearms related materials, including the pistol brandished and discharged during the Robbery;

        (c)     A gold New York license plate HNE1777; and

        (d)     Cash or proceeds obtained in the course of the Robbery.

19

**ATTACHMENT B-2**

Property to be Seized

1.      All evidence, instrumentalities, contraband, or fruits of a violation of Title

18, United States Code, Section 1951(a) (the "SUBJECT OFFENSE"), involving the March 29,

2021 armed robbery of the Hilton Garden Hotel located at 1100 South Avenue, Staten Island,

New York 10314 (the "Robbery"), found within the SUBJECT VEHICLE, as described in

Attachment A-2, or within any locked or closed containers therein.

2.      Evidence, instrumentalities, contraband, or fruits of the SUBJECT

OFFENSE includes but is not limited to:

(a)      The SUBJECT VEHICLE;

(b)      Items of clothing worn by Suspect-2 and identified in surveillance

footage of the Robbery, including a dark colored hooded jacket with a

cross-stitched pattern and black and white Nike sneakers;

(c)      Any firearm(s), ammunition, magazine(s), or other firearms related

materials, including the pistol brandished and discharged during the

Robbery;

(d)      New York motor vehicle license plate HNE1777; and

(e)      Cash or proceeds obtained in the course of the Robbery.

20

**ATTACHMENT B-3**

Property to be Seized

1.      All records on the SUBJECT PHONE described in Attachment A-3 that constitute evidence, instrumentalities, contraband, or fruits of a violation of Title 18, United States Code, Section 1951(a) (the "SUBJECT OFFENSE"), involving the March 29, 2021 armed robbery of the Hilton Garden Hotel located at 1100 South Avenue, Staten Island, New York 10314 (the "Robbery"), for the period from March 1, 2021 through April 21, 2021, including but not limited to:

(f)      Records and communications regarding the Robbery;

(g)      Any evidence of the possession of firearms;

(h)      Evidence of the times the SUBJECT PHONE was used;

(i)      Passwords, encryption keys, and other access devices that may be necessary to access the SUBJECT PHONE;

(j)      Records and information relating to STEVEN ALLESANDRO's appearance and clothing;

(k)      Records of internet search and browsing history relating to the Robbery;

(l)      Records demonstrating or identifying ALLESANDRO's social media accounts;

(m)      Records of locations of the SUBJECT PHONE;

(n)     Bank records, checks, credit card bills, account information and other financial records reflecting the receipt, disbursement, or transfer of funds or other monetary transactions;

(o)     All subscriber information or contact information, to include, names, addresses, telephone numbers, email addresses, or other identifiers located in a contact list, phone book, or otherwise;

(p)     The identity of any co-conspirator(s) involved in the SUBJECT OFFENSE;

(q)     Any communications between ALLESANDRO and any co-conspirator(s) involved in the SUBJECT OFFENSE;

(r)     Any information regarding ALLESANDRO's schedule or travel on March 29, 2021;

(s)     Contextual information necessary to understand the evidence described in this attachment; and

(t)     Evidence of user attribution showing who used or owned the SUBJECT PHONE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

2.     As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been

created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

    3.  This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.   The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.   Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.